## NEW YORK SUPERIOR COURT

JOHN WILSON and others agt. EDWIN D. MORGAN and others.

A *charter party* requiring the *freight* to be paid in *silver or gold dollars,* can be satisfied by payment in legal tender United States notes, and a *tender* of the freight in such notes discharges the debt. (*This seems to be adverse in principle to* Carpenter agt. Atherton, *28* How. Pr. R. *303, and* Luling agt. The Atlantic Mu. Ins. Co. *30 Id.* 69.)

General Term, March, 1866.
Before MONELL, GARVIN and JONES, Justices.

THE plaintiffs, owners of the British ship Atalanta, by their agents, George Henderson & Co., in Calcutta, chartered the ship to Gillanders, Arbuthnot & Co., of Calcutta. The charter party was made in Calcutta, and is dated January 20, 1863. It contains the following clause : " The freight to be paid on unloading and right delivery of the cargo, as follows, viz : if discharged in United States of America, in silver or gold dollars, or by approved bills on London, if at a port in the United Kingdom, as customary."

Wilson agt. Morgan.

The defendants were consignees of the cargo. Upon the arrival of the vessel at the port of New York in June, 1863, the defendants tendered payment of the freight, amounting to $32,630, in United States legal tender notes. The tender was refused, and payment demanded in silver or gold dollars, as specified in the charter party, which was refused. The action was tried by a referee, who found the tender of the United States legal tender notes, and that at the time of such tender the market value thereof was thirty-three and one-eighth per cent less than that of gold and silver dollars.

By an arrangement between the parties, the plaintiffs credited the defendants with the market value of the amount tendered, leaving a balance of $7,684.57 due. The referee found the market value of such balance was, in the currency of the United States, $10,230.08. Upon these facts the referee decided that the plaintiffs were entitled to recover said sum of $10,230.08, with interest, and rendered judgment accordingly. The defendants appealed.

E. Terry, *for appellants.*

A. F. Smith, *for respondents.*

By the court, Monell, J. The act of congress passed February 25, 1862, provides that the notes by that act authorised to be issued, shall be " lawful money, and a legal tender in payment of all debts, public and private, within the United States, except," &c (12 *United States Statutes at Large, p.* 711). The validity of the act is not open for discussion in this state. (*Metropolitan Bank* agt. *Van Dyck,* 27 *N. Y. R.* 400 ; *Meyer* agt. *Roosevelt, Id.*) In those cases the tender of treasury notes, made lawful money by the act of congress, was held to satisfy a debt which had been contracted before the passage of the act, to be paid in the then " lawful money of the United States." The general theory of these decisions, and of all the decisions of other

courts upholding the power of congress to create other
lawful money than gold or silver coin is, that by the omis-
sion in the constitution of the United States to declare
what shall or shall not be a legal tender, and the prohibi-
tion to the states to make anything besides gold and silver
a legal tender, the power, by necessary implication, is con-
ferred on the general government.    Hence, at different
periods, congress has designated what should be legal ten-
der.    In 1792 they established a mint for coining gold and
silver, which, by the same act, was made lawful money for
the payment of all debts.    In 1793 they made certain for-
eign coin a legal tender, and from time to time have regu-
lated the value of foreign and domestic coin.    These acts
have never been questioned, yet the power to pass them is
not expressly given to congress by any provision in the
federal constitution.    Hence they can be sustained only
upon an implication of power.    Congress is not confined
to the exercise of powers expressly granted.    The supreme
court of the United States in *McCulloch* agt. *The State of
Maryland* (4 *Wheat.* 416). and *Gibson* agt. *Ogden* (9 *Wheat.*
188), wholly rejects any such limitation, and the court of
appeals in the cases cited (*supra*), follows those decisions.

The charter of the vessel in this case was made in Jan-
uary, 1863, nearly a year after the passage of the legal
tender act, and the parties are presumed to have made
their contract with reference to the existing law (*Denite*
agt. *Brisbane* (16 *N. Y. R.* 508).   For purposes of con-
struction and ascertaining the intention of parties, the
place of performance is the place of the contract.   It is,
therefore, to be assumed that the parties were cognizant
of the law of the United States making paper money a legal
tender in payment of all debts, and were also cognizant of
the interpretation of that law by our courts.   It was sub-
stantially conceded on the argument, by the respondents'
counsel, that if a debt existed in this case it could be sat-
isfied by an offer of legal tender notes.   That, it appears

to me, was conceding too much, as it is entirely clear a debt did exist. A charter party is but a contract for the entire or some principal part of a ship for the conveyance of goods on a determined voyage, or for employment in other trade, and contains covenants by each party. In the charter before us, it was mutually agreed that the freight should be paid on unloading and delivery of the cargo. The lien which the owners had for their charter freight was a mere security, and it might have been waived, but the waiver would not have discharged the contract to pay freight. The right to collect freight by action has frequently been adjudged. In *Clarkson* agt. *Edes* (4 *Cow.* 470), it was held that the owner might insist on his lien, or by action compel payment; and in *Barker* agt. *Havens* (17 *Johns. Rep.* 234), an action to recover freight from the consignor was sustained after the goods had been delivered to the consignee without payment. And where freight is payable on delivery of the goods, the consignee by accepting the delivery renders himself personally liable for the freight (*Cook* agt. *Taylor*, 13 *East. Rep.* 399). The obligation to pay freight is a debt, whether the obligation arises from an express or an implied agreement. Any agreement by which one party promises to pay money to another party, is a debt. So, also, any agreement which expressly or impliedly imposes an obligation to pay money, is a debt. The freight due from the defendants' consignors, and for which an action could have been maintained, was a debt which they could have satisfied by payment. The defendants, as consignees of the goods, were mere factors of the consignors (*Story on Ag.* § 33). Payment by them would have discharged the debt of their principal. The argument of the respondents' counsel proceeds upon the ground that no debt existed as between the owners and consignees. He seemed to lose sight of the consignors' agreement to pay freight (which agreement created a debt), and also of the duty as well as right of the consignees to satisfy such

debt of their principal by payment. And the question is not changed by the position of the parties on the record, especially under the stipulation in the case.

But the main question in the case is, can a contract to pay in silver or gold dollars be satisfied by payment in any other kind of money? Congress, by the legal tender act, has made a paper dollar the equivalent of a gold or silver dollar. Having the power to establish and regulate the value of coin, it has depreciated the value of gold and silver coin for every purpose cognizable by courts to the level of paper money, and has declared that one of its notes, representing the value of one hundred cents, shall be equal to a gold or silver dollar, representing the value of the same number of cents. The power is not confined to paper money. Any other substance might be made the medium of exchange, and declared lawful money. The uncoined and unstamped bits of silver of the ancients, which were weighed out, and not counted, and the wampum of the Indians, were money. Money is the mere representative or supposed representative of definite value. The precious metals among all civilized nations, are the usual accepted representatives. Gold and silver are standards of value, which regulate in a greater or less degree, all other values. Any other standard of value would do the same thing. A ton of coal or a barrel of flour, if made by law the standard of value, would regulate and adjust all other values, gold as well as merchandise. Gold and silver coin at their established value, for all legal purposes, do not change : they are never depreciated or appreciated. It is erroneous to say the market for gold fluctuates, except when it is trafficked in as a commodity. As coin, or a medium of currency, its value as fixed by law, does not change with the mutations of trade and commerce. All other things rise or fall in the fluctuations of business by comparison merely. Congress having created paper money, and rendered it nominally, for all legal purposes equal to

gold, there no longer remains in legal contemplation, any difference between them. The practical or actual depreciation of the former below the value of gold is not produced by any law, but is occasioned by the laws of trade, of supply and demand, and other causes for which the law is not accountable. Used in commerce with foreign countries, gold and silver are the only accepted mediums of exchange, and their value is attributable to their universal appreciation and currency among all nations. In domestic commerce, however, they lose some of their importance by the substitution of other standards of value, which are made their equivalent. As an article for traffic, gold, either in coin or bullion, is regulated by the same rules that govern other commodities. Contracts for its purchase or sale are valid, and are regarded like contracts for the purchase or sale of merchandise. There is a wide difference, however, between gold or silver as merchandise and as money. A contract to buy or sell gold cannot be specifically enforced—an action for damages being entirely adequate—the rule of damages being in such a case, probably, the market value of the gold. As circulating mediums, gold and silver are not subjected to any of the rules or principles which regulate contracts. It is used only to purchase property, to discharge obligations and pay debts. A paper dollar having been made equal to a gold dollar, it must be accepted as such in satisfaction of any contract for the payment of money, and no form or force of words can be used by contracting parties to give a gold dollar a legal value as money above a paper dollar. A dollar is one hundred cents, no more, no less, whether it is silver, gold or paper, and when congress declares that a paper dollar shall be current, and pass for and represent, and be of the value of one hundred cents, for all purposes of traffic and paying debts, it becomes the equivalent of one hundred cents in any other substance or form. It has been strongly urged that congress, in declaring paper money a legal ten-

der in payment of debts, has recognised and preserved a distinction between it and coin, and the exception in the statute, of duties on imports and interest on the public debt, is mainly relied on to establish such distinction. It is true that congress has also, from time to time, authorised the issuing of bonds and notes, the interest and principal of which is expressly payable in coin. (12 *U. S. Statues at Large*, 345, § 5; 709, § 1; 13 *Id.* 13.) Such bonds and notes, however, were to become a part of the public debt of the country, and were accordingly brought within the great leading principle of the government, of paying specie, which has existed at intervals for more than three-quarters of a century, having been originally enacted in 1789, re-enacted in 1840, and again in 1846. The exception, therefore, in the statute, of duties on imports and interest on the public debt, as well as all subsequent legislation creating or prescribing the manner of payment of the public debt, are but re-enactments of the acts referred to, and especially of the act commonly denominated the sub-treasury act, passed by congress in 1840 (5 *U. S. Stat. at Large*, 385), and the act of August 5, 1846 (9 *Id.* 59). Those acts provided that all sums accruing or becoming payable to the United States for duties, taxes, sales of public lands or other debts, should be paid in gold and silver only, and that all payments by the United States should also be made in gold and silver coin only. It was not intended by the legal tender act of 1862, nor by any of the subsequent acts, to change the policy of the general government of paying in specie, and the exception, therefore, became necessary merely to preserve the provisions of former statutes. Since the passage of the act of August, 1846, payments to and by the general government have been made in coin only, or in notes issued under the authority of the United States, and directed to be received by law. In thus following the long established practice of the government of paying coin only, congress has indicated

Wilson agt. Morgan.

nothing that could be construed into a design to create any legal difference between gold or silver and paper money, as a legal tender in payment of private debts. Indeed, the exception gives force and explains the meaning of the previous parts of the sentence. From the views which I have here expressed, it follows necessarily, it seems to me, that a contract which creates a debt, which debt can be paid with money, can be satisfied by any money which is a legal tender at the time the debt is to be paid, and can be satisfied in no other way. Indeed, I do not see how a contract can be framed by which a party to it could be compelled to pay money in silver or gold, when some other substance* is made by law sufficient to satisfy the debt. Let us test it by an example. Suppose the plaintiffs had sued to recover the freight, would the judgment have been for so many dollars in silver and gold? Such a judgment could not be rendered. The recovery would be for so many dollars, and the judgment could be satisfied by the payment of the number of dollars in any money which was a legal tender at the time. The defendants' consignors had agreed to pay a certain sum of money, and they had agreed that it should be paid in silver and gold dollars. Could the owners have required a specific performance of the contract? Certainly not. It was to pay money, not gold and silver dollars, and the sum of money only was recoverable. This rule is recognised and well settled when applied to contracts payable in chattels. (*Pinney* agt. *Gleason*, 5 *Wend.* 393 ; *Rockwell* agt. *Rockwell*, 4 *Hill*, 164.) I know it is said that the practical or marketable difference in value of paper money and coin, must be presumed to have been within the contemplation of parties engaging to pay in coin, and that, therefore, such difference should be recoverable as damages, and such seems to have been the view taken by the referee in this case. It is also supposed that upon a contract to pay a sum of money in gold, a recovery may be had for the value of gold as ascertained

by comparison with paper money. But the difficulty with the suggestion is, that it does not recognise or admit the distinction which exists between gold as a commodity of traffic and gold used as money. A contract to deliver one thousand dollars of gold, is a very different contract from one to pay such sum in gold. The former can be specifically enforced, and the other can be satisfied by gold or its equivalent. Money being the common measure of all things, has not, like other things, any particular function. It takes the place of all other things, but is represented only by standards created by law. Gold in bars is no more " money " than are pigs of iron, lead or copper. Like them it may be bought and sold by weight, but until it is " coined," and the value of the coin is ascertained and declared by law, it is no more a medium of exchange or currency than any other metal would be. I am unacquainted with any rule of damages for the non-payment of money other than the legal rate of interest upon it. At common law not even interest was recoverable, either as an incident to the debt or otherwise; but statutes and adjudications have relaxed the common law, and it is now allowed as damages (*Sedg. on Damages*, 234). " Interest," says *Domat.*, *liv. iii.*, *tit. v*, *sec.* 1, " is the name applied to the compensation which the law gives to the creditor who is entitled to recover a sum of money from the debtor in default." The loss experienced by those who are not paid at maturity, is as diversified as the use they might make of the money, and as unforeseen as the wants from which the injury might arise. But no such loss is recoverable. The damages are limited to the infliction of interest merely. The recovery of the current rate of exchange besides interest, upon a debt contracted in Great Britain, was refused in *Martin* agt. *Franklin* (4 *Johns. Rep.* 124), and in *Schofield* agt. *Day* (20 *Id.* 102), and I do not think a case can be found which sustains any measure of damages for the non-performance of a contract to pay money, other than

interest, upon the sum in default. To adopt any other measure would destroy the efficacy of the legal tender act, and limit its effect by admitting factitious values to regu-late the damages. The plaintiffs' view cannot, therefore, in my judgment, be sustained upon any principle applica-ble to the recovery of the difference in value between paper and gold money as damages ; nor upon any principle applicable to the specific performance of contracts ; and no other principle has been suggested upon which it can be sustained. The contract in this case was to pay a sum of money, which became a debt. The offer of money which had been made a legal tender in payment of all debts, was sufficient to discharge the obligation, and the agreement to pay in silver and gold dollars, had no greater effect than if it had been to pay in the " lawful money of the country." But the question is not new nor without authority. The cases in the court of appeals, before referred to, substan-tially determine the question. The moment the validity of the act is assumed, the consequences flowing from it are apparent. Judge Davies says (page 459), " it is the law-ful money of the United States, made such by its autho-rity, that can only be effectually used in payment of debts, without reference to the intrinsic value of the thing ten-dered or paid." We were referred on the argument to decisions made in some of the states of the union, enter-taining views apparently opposed to those I have here expressed. As we have been furnished with only newspa-per reports of these cases, we cannot be certain of the pre-cise questions raised and decided. The case of *Mervine* agt. *Sailor*, in the district court of Pennsylvania, held that a quit-rent payable in " lawful silver money," could not be extinguished by the payment of a sum in gross in legal tender notes. But the decision was solely upon the ground that the quit-rent was not a debt, and, therefore, not within the provisions of the legal tender act. The right to satisfy a debt with legal tender money is fully recognised. The

rent in that case was payable in "silver weighing seventeen pennyweight and six grains," and the learned Justice HARE says, that neither could the payment of such rent be specifically enforced, nor could the difference in value between the silver and legal tender money be recovered as damages. Two *nisi prius* cases in the supreme court of this district were also referred to (*Chapin* agt. *Pretzfelder, Prouty* agt. *Potter*), and one case at special term (*Luling* agt. *Atlantic Mu. Ins. Co.* 30 *How. Pr. Rep.* 69). The first two cases do not seem to have been much considered, and the report of them is too meagre to enable us to see what was intended to be decided; and the last case was a proceeding in equity to require the payment of dividends in gold. There is nothing, therefore, in any of these cases beyond a mere *dictum* in two of them, which is hostile to the views we have here taken. On the other hand, we were referred to numerous decisions in the state courts, extracted from newspapers, sustaining our position. The only one which has got into the books is *Warnibold* agt. *Schlicting* (16 *Iowa*, 243), in which the supreme court of that state held that a promissory note payable in "United States gold," was satisfied by a tender of legal tender notes. The opinion of the chief justice is able, and his reasoning, to my mind, conclusive. My conclusion is, that the charter party requiring the freight to be paid in silver and gold dollars, could be satisfied by payment in legal tender notes, and that a tender of the freight in such notes discharged the debt. The referee should, therefore, have held the tender sufficient, and it was error to award judgment for the plaintiffs.

The judgment must be set aside and a new trial ordered, with costs of the appellants to abide the event.

GARVIN and JONES, Justices, concurred.