## Case No. 6,580.

### HOFFMAN et al. v. YARRINGTON.

### [1 Lowell, 168.] [1]

District Court, D. Massachusetts. Oct., 1867.

SEAMEN—VESSEL UNFIT FOR SERVICE — CONDEMNATION IN FOREIGN PORT — EXTRA WAGES—EXPENSE OF PASSAGE HOME—COSTS.

1. Where an American vessel has been condemned in a foreign port as unfit for service, and sold, and it appears that the master has acted in good faith, and as a prudent owner would do if uninsured, and nothing more is shown, excepting that the ship had met with some rough weather and some injuries from perils of the seas: *Held*, the crew could not recover two months' extra wages; for they are within the proviso of section 26 of the act of August 18, 1856 (11 Stat. 62), denying extra wages when a ship is condemned as unfit for service.

[Cited in The Wenonah, Case No. 17,412; Gove v. Judson, 19 Fed. 524; Kelly v. Otis, 23 Fed. 905.]

2. Nor in such a case can the crew recover the expense of their return to the United States.

[Cited in Kelly v. Otis, 23 Fed. 905; The Frank & Willie, 45 Fed. 490.]

3. How far the act of 1856 is inconsistent with sections 12-15 of the act of July 20, 1840 (5 Stat. 396), which gives extra wages when inspectors find a ship to have been sent to sea unsuitably provided in any important or essential particular, quaere?

[Cited in Brown v. Chandler, Case No. 1,998.]

4. Whether the court could try the questions of which inspectors and consuls are made the judges by the act of 1840, §§ 12-15, quaere?

5. Where the master in settling with the crew paid each man thirty-seven dollars too little, by mistake, but afterwards, before suit brought, refused to correct the error, costs were given the crew, though the extra wages demanded by them were found not to be due.

Libel by the seamen of the brig Marshall for wages. The voyage was from Boston to the west coast of Africa, and the master [Richard H. Yarrington] intended to trade up and down the coast until the outward cargo of rum and tobacco should be bartered for palm oil and other products of the country to load the ship for home. The brig met with heavy weather on the passage out, and after being on the coast for some months lost an anchor and damaged her windlass,

1 [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

so that the master thought best to go to Lagos, about three hundred miles to the leeward of the place where this misfortune was encountered, for repairs. Arriving at that port, she was not repaired, but was condemned and sold. The master acted in good faith, and with a view to the best interests of the owners, although at a loss to them and him. The vessel was unseaworthy and unfit to keep the seas, and how far this result was due to decay and ordinary wear and tear, and how far to the perils of this voyage, were points in controversy, but not very fully explained by the testimony. The libellants [Augustus Hoffman, and others] were paid what the master computed to be their full wages to the time of the sale of the brig, and their expenses to the nearest consular port, and they now claimed two months' extra wages, as for a sale of the vessel abroad; or their expenses home, as well as an alleged balance remaining unpaid of their wages at Lagos.

C. G. Thomas, for libellants.

This is a case for the payment of the two months' wages provided by the act of February 28, 1803, § 9 (2 Stat. 203). The Dawn [Case No. 3,665]; Pool v. Welsh [Id. 11,269]. Or, if not, then for the necessary expenses of the passage home. The Dawn [Id. 3,666], second opinion. Even a forced sale is within the statute.

T. H. Russell, for respondent.

We rely on the cases cited on the other side as showing that where there is in fact a sale by necessity, the statute does not require two months' wages to be paid beyond the amount actually due by the articles.

LOWELL, District Judge. The cases cited in argument decide that the statute of 1803, § 9, refers to voluntary sales; and that all sales will be treated as voluntary which are made from a mere consideration of the preponderance of advantage to the owners, without an overruling necessity. Judge Ware says that if the ship could be repaired within a reasonable time and at a reasonable expense, the seamen have a right to demand the extra wages, if the master, for reasons of his own, fails to repair; citing the case in Gilpin; and that the burden of proving necessity is on the owners. In Wells v. Meldrun [Case No. 17,402], Judge Betts decided that when a vessel was condemned and sold in a foreign port for unseaworthiness caused by natural decay and not by a casualty, it was such a sale as the statute contemplated, and the two months' pay could be recovered.

The evidence of an overruling necessity in this case is not very strong, and if the law of those decisions governed this, I ought perhaps to decree the two months' pay; but it seems to me that the proviso of section 26 of the act of August 18, 1856 (11 Stat. 62), passed long after those decisions were made,

must be my guide. It provides: "That in case of wrecked or stranded ships or vessels, or ships or vessels condemned as unfit for service, no payment of extra wages shall be required;" thus distinctly recognizing the very state of affairs which has occurred here. The language seems to include all vessels condemned as unfit for service, whether their unfitness has arisen from wreck or stranding or any other cause. Without saying that it would apply when a vessel has been sent to sea in such a condition that the owners ought to have known she was unfit, or even to a case where there has been no extraordinary peril, as to which I shall speak more at large hereafter, I hold that this statute denies the extra wages when the facts merely are that a vessel needing repairs from a sea peril has been condemned, and the master has acted in good faith, and his conduct has been such as a prudent owner would have adopted in like circumstances had he been uninsured, which is shown to be true of this sale.

It has been strenuously urged that the libellants are, at all events, entitled to the expenses of their return home, as decided by Judge Ware in his second opinion in The Dawn [supra]. Upon the rehearing of that case, it appeared that the vessel had met with such injuries as to be a wreck, and the decision was that the statute of 1803 did not cover such a case, and that by the maritime law the crew were entitled to receive out of the property a salvage compensation equal to the cost of their passage home, which was estimated at one month's wages. It would, perhaps, have been quite as consistent with the facts of the case to rest the decision upon the ground that on a forced breaking up of the voyage, by overruling necessity, without an actual total loss of the vessel, the crew are to have their passage home provided at the expense of the ship; for there was no evidence of any salvage service performed by the crew, or by any one, or of any thing resembling salvage in the case. But here again the statute of 1856, by taking away the two months' wages, deprives the crew of all damages, because those wages were given instead of damages, and fixed an arbitrary standard which might, as in the case of The Dawn, have been more than the expenses of return, but which in long voyages might be less. Judge Peters used to allow one month's pay for a voyage broken up in the West Indies, two months if in Europe, and three months if in India. Hindman v. Shaw [Case No. 6,514].

By the general maritime law the owners of a ship have a right to break up the voyage; that is to say, the crew have no power to enforce a specific performance of the contract, but they have a right to damages, depending upon the circumstances of each case. Curt. Merch. Seam. 296 et seq., and cases; The Elizabeth, 2 Dod. 403; The Atalanta [Case No. 1,819].

As early as the year 1792 congress regulated this matter, and declared that if an American vessel should be sold in a foreign port, the master, unless the crew were liable by their contract, or consented to be discharged there, should send them back to the state where they entered on board, and should furnish them with means sufficient for their return, to be ascertained by the consul at the port. 1 Stat. 256, § 8. This was repealed by the act of 1803, § 5 (2 Stat. 203), which established the unvarying rule, which is still the general rule, of three months' pay (two for the men and one for the United States) whenever a vessel is sold abroad and her crew discharged, or when a seaman is discharged abroad with his own consent. By the act of July 20, 1840, §§ 12–15 (5 Stat. 396), upon complaint in writing of an officer and a majority of the crew that a vessel is unfit to go to sea, because she is leaky, or insufficiently supplied or manned, the consul may appoint inspectors to examine into the causes of complaint and report thereon to the consul; and they shall further report whether the vessel was sent to sea unsuitably provided in any important or essential particular by neglect or design, or through mistake or accident; and if either of the former, the consul, if he approves the report, is to discharge such of the crew as require it, each of whom shall be entitled to three months' pay besides the wages due him; but if the defects resulted from mistake or accident, and could not in the exercise of ordinary care have been known and provided against, then if the master shall in a reasonable time remove the causes of complaint, the crew shall remain and discharge their duty; otherwise they shall be discharged with one month's additional pay. Then comes the act of August 18, 1856, § 26 (11 Stat. 62), with the proviso before cited concerning vessels condemned as unfit for service. This statute at section 33 expressly repeals certain parts of the act of 1840, but not sections 12–15, unless by the general repeal of acts and parts of acts inconsistent. How far they are inconsistent as applied to a vessel condemned and sold for defects in her hull or spars is not perfectly clear. It may be said that if the crew apply and obtain a report that the vessel was unfit for sea when she left the United States, they should be entitled to three months' or one month's pay, as the case may be, although the vessel should be condemned as unfit for service; and that the proviso of the later law applies only to cases where some casualty has caused, or at least contributed, to the unfitness. On the other hand, the argument may be that the act of 1840 is intended only for cases where some ordinary and proper equipment has been neglected, as of tackle, boats, provisions, &c., and not to the wearing out of a ship which may be foreseen as likely to happen, but the precise time of which cannot be foreseen. I will not ex-

press an opinion upon this point, because in this case there was not only no inspection, nor a request for one, but neither party has cited or relied on either of these statutes, and the evidence has not been addressed to the issues either of law or fact which would arise under them. The case falls within the terms of the proviso, and it would be for the crew to show, that it was an exceptional case, properly calling for action under the act of 1840. Whether the court could exercise the duties of inspectors and consul in such a case as this, if the vessel had been condemned at a port where there was no consul, may likewise be reserved for consideration when it shall arise.

The master made a mistake in his computation, and owes each of the libellants thirty-three dollars, and I shall give them costs, because the error was pointed out to him and he refused to correct it. Decree accordingly.